**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**
**EL PASO DIVISION**

| | |
|---|---|
| **BRANDON CALLIER,** §<br>§<br>    **Plaintiff,** §<br>§<br>    **v.** §<br>§<br>**DR Q MEDICAL SUPPLY LLC,** a Texas §<br>Limited Liability Company, **OWAIS SHAMSI** and §<br>**DR AMIR QURESHI, MD** §<br>§<br>    **Defendants.** §<br>§ | **EP-24-cv-00032-KC** |

**PLAINTIFF'S ORIGINAL COMPLAINT**

**PARTIES**

1.      Plaintiff BRANDON CALLIER ("Plaintiff") is a natural person, resident of the Western District of Texas, and was present in Texas for all calls, in this case in El Paso County, Texas.

2.      Defendant DR Q MEDICAL SUPPLY LLC ("DR Q") is a limited liability company organized and existing under the laws of Texas and can be served via registered agent Shamsi Shamsi, 355 Vistaglen Drive, Apt 4223, Plano, Texas 75071.

3.      Defendant DR AMIR QURESHI, MD, ("Dr. Qureshi") is a managing member of Dr. Q, personally participated in and directed the activities alleged herein, and can be served at 5733 Northbrook Drive, Plano, Texas 75093.

4.      Defendant OWAIS SHAMSI ("Shamsi") is the Director of Defendant Dr. Q Medical Supply LLC, personally participated in and directed the activities alleged herein, and can be served at 355 Vistaglen Drive, Apt 4223, Plano, Texas 75071.

1

## JURISDICTION AND VENUE

5.      This Court has subject matter jurisdiction over Count I under 28 U.S.C § 1331, because

the claims arise under the federal Telephone Consumer Protection Act, 47 U.S.C. § 227.  *See*

*Mims v. Arrow Fin. Servs., LLC*, 565 U.S. 368, 386-87 (2012) (holding that federal courts have

federal question jurisdiction over private actions brought under the TCPA).

6.      The Court has supplemental jurisdiction over Count II under 28 U.S.C § 1367.

7.      This Court has general personal jurisdiction over Defendants Dr. Qureshi and Shamsi

because they are both Texas residents.

8.      This Court has general personal jurisdiction over Defendant Dr Q because Dr Q is a

Texas limited liability company.

9.      Venue is proper under 28 U.S.C. § 1391(b)(2).

## THE TELEPHONE CONSUMER PROTECTION ACT

## OF 1991, 47 U.S.C. § 227

10.      In 1991, Congress enacted the TCPA to restrict the use of sophisticated telemarketing

equipment that could target millions of consumers *en masse*.  Congress found that these calls

were not only a nuisance and an invasion of privacy to consumers specifically but were also a

threat to interstate commerce generally.  *See* S. Rep. No. 102-178, at 2-3 (1991), as reprinted in

1991 U.S.C.C.A.N. 1968, 1969-71.

11.      The TCPA makes it unlawful "to make any call (other than a call made for emergency

purposes or made with the prior express consent of the called party) using an automatic

telephone dialing system or an artificial or prerecorded voice … to any telephone number

assigned to a … cellular telephone service." 47 U.S.C. § 227(b)(1)(A)(iii).

2

12. The TCPA makes it unlawful "to initiate any telephone call to any residential telephone line using an artificial or prerecorded voice to deliver a message without the prior express consent of the called party, unless the call is initiated for emergency purposes, is made solely pursuant to the collection of a debt owed to or guaranteed by the United States, or is exempted by rule or order" of the Federal Communication Commission ("FCC"). 47 U.S.C. § 227(b)(1)(B).

10. The TCPA provides a private cause of action to persons who receive calls in violation of § 227(b). 47 U.S.C. § 227(b)(3).

11. Separately, the TCPA bans making telemarketing calls without a do-not-call policy available upon demand. 47 U.S.C. § 227(c); 47 C.F.R. § 64.1200(d)(1).

12. The TCPA provides a private cause of action to persons who receive calls in violation of § 227(c) or a regulation promulgated thereunder. 47 U.S.C. § 227(c)(5).

13. According to findings of the FCC, the agency vested by Congress with authority to issue regulations implementing the TCPA, automated or prerecorded telephone calls are a greater nuisance and invasion of privacy than live solicitation calls and can be costly and inconvenient.

14. The FCC also recognizes that "wireless customers are charged for incoming calls whether they pay in advance or after the minutes are used." *In re Rules and Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 18 FCC Rcd. 14014, 14115 ¶ 165 (2003).

15. The FCC requires "prior express written consent" for all autodialed or prerecorded telemarketing robocalls to wireless numbers and residential lines. In particular:[A] consumer's written consent to receive telemarketing robocalls must be signed and be sufficient to show that the consumer: (1) received clear and conspicuous disclosure of the consequences of providing the requested consent, *i.e.*, that the consumer will receive future calls that deliver prerecorded

messages by or on behalf of a specific seller; and (2) having received this information, agrees

unambiguously to receive such calls at a telephone number the consumer designates. In addition,

the written agreement must be obtained without requiring, directly or indirectly, that the

agreement be executed as a condition of purchasing any good or service.

16.     *In the Matter of Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*,

27 FCC Rcd. 1830, 1844 ¶ 33 (2012) (footnote and internal quotation marks omitted). FCC

regulations "generally establish that the party on whose behalf a solicitation is made bears

ultimate responsibility for any violations."  *In the Matter of Rules and Regulations Implementing*

*the Tel. Consumer Prot. Act of 1991*, 10 FCC Rcd. 12391, 12397 ¶ 13 (1995).

17.     The FCC confirmed this principle in 2013, when it explained that "a seller … may be

held vicariously liable under federal common law principles of agency for violations of either

section 227(b) or section 227(c) that are committed by third-party telemarketers." *In the Matter*

*of the Joint Petition Filed by Dish Network, LLC*, 28 FCC Rcd. 6574, 6574 ¶ 1 (2013).

18.     Under the TCPA, a text message is a call. *Satterfield v. Simon & Schuster, Inc.*, 569 F.3d

946, 951 – 52 (9th Cir. 2009).

19.     A corporate officer involved in the telemarketing at issue may be personally liable under

the TCPA. *E.g.*, *Jackson Five Star Catering, Inc. v. Beason*, Case No. 10-10010, 2013 U.S. Dist.

LEXIS 159985, at *10 (E.D. Mich. Nov. 8, 2013) ("[M]any courts have held that corporate

actors can be individually liable for violating the TCPA where they had direct, personal

participation in or personally authorized the conduct found to have violated the statute." (internal

quotation marks omitted)); *Maryland v. Universal Elections*, 787 F. Supp. 2d 408, 415 – 16 (D.

Md. 2011) ("If an individual acting on behalf of a corporation could avoid individual liability,

the TCPA would lose much of its force.").

**The Texas Business and Commerce Code § 302.101**

20.    The Texas Business and Commerce Code requires sellers to obtain a registration

certificate from the Secretary of State in order to make telephone solicitations inside the state of

Texas or to residents located in the state of Texas.

21.    The Plaintiff may seek damages for violations of Texas Business and Commerce Code §

302.101 of up to $5,000 per violation, reasonable costs of prosecuting the action, court costs,

investigation costs, depositions expenses, witness fees, and attorney's fees.

22.    Texas Business and Commerce Code § 302.101 provides a private right of action.  A

violation of Chapter 302 "is a false, misleading, or deceptive act or practice under Subchapter E,

Chapter 17" and is enforceable as such: "A public or private right or remedy prescribed by

Subchapter E, Chapter 17, may be used to enforce [Chapter 302."  Tex. Bus. & Com. Code §

302.303.

23.    The use or employment by any person of a false, misleading, or deceptive act or practice"

causes "economic damages or damages for mental anguish."  Tex. Bus. & Com. Code § 17.50.

**FACTUAL ALLEGATIONS**

24.    Plaintiff personally successfully registered his phone number ending in 4604 on the

National Do-Not-Call Registry ("DNC") in December 2007.

25.    Plaintiff was registered on the National DNC at all times relevant to this Complaint.

26.    JD Group Inc. ("JD Group") offers COVID-19 test kits to Medicare recipients and then

charges Medicare for the test kits.

27.    Each and every phone call in this case is a solicitation phone call where Plaintiff was

contacted by Dr. Q on behalf of JD Group so that JD Group could ship "free" COVID-19 test

kits to Medicare recipients and then bill Medicare for those "free" test kits.

28.     On May 1, 2023, Plaintiff filed case number EP-23-cv-00179-DCG against JD Group Inc. alleging TCPA violations.

29.     On June 12, 2023, JD Group Inc. filed a Third-Party Complaint against JR Dallas Wealth Management LLC ("JR Dallas") alleging that JR Dallas Wealth Management LLC had placed the TCPA violating phone calls alleged by Plaintiff.

30.     JD Group contracted with JR Dallas to solicit their COVID-19 test kits.  As part of the telemarketing services, JR Dallas provided other people's Medicare numbers and information without verifying the identity of the people to whom they were giving the information.

31.     Plaintiff filed his First Amended Complaint on August 30, 2023, alleging TCPA violations against JR Dallas.  The Court granted Plaintiff's Motion for leave to amend on September 1, 2023.

32.     On December 17, 2023, JR Dallas informed Plaintiff that the actual lead generator that made the phone calls was Dr. Q.

33.     Dr. Q provided Plaintiff's father's (Elston Tatum) Medicare number to Plaintiff without verifying Plaintiff's name, or whether Plaintiff, was even Elston Tatum ("Tatum").

34.     Dr. Q at the direction of Defendants Shamsi and Dr. Qureshi, illegally purchased Medicare numbers without the knowledge or consent of the Medicare recipients.

35.     The Office of Management and Budget ("OMB") considers Medicare numbers personally identifiable information ("PII".)

36.     Tatum never gave Dr Q, Dr. Qureshi, or Shamsi his Medicare number, never had any association with Dr. Q, or knew of Dr. Q's existence before being informed about Dr. Q by JR Dallas on December 17, 2023.

37.     The Patient Access and Medicare Protection Act of 2015 made it illegal to buy, sell, and distribute Medicare and Medicaid numbers and other health information identifiers.

38.     Dr. Q, at the direction of Shamsi and Dr. Qureshi purchased and illegally obtained Tatum's Medicare number.

39.     Dr. Q illegally distributed Tatum's Medicare number to Plaintiff Callier.

40.     Under the Patient Access and Medicare Protection Act of 2015 individuals found guilty of misappropriating the medical identifiers of health care providers or beneficiaries face up to 10 years in prison and a $500,000 fine.  Corporations that engage in such a practice are subject to fines of up to $1,000,000.

41.     Tatum began his first job in 1974 and has been prepaying Medicare for the past 50 years.

42.     Plaintiff received the first of at least seventeen (17) phone calls from Defendant Dr. Q on March 1, 2023.

43.     Call #1.  On March 1, 2023, Plaintiff received a phone call that displayed 970-552-0615 on the caller identification.  Plaintiff did not answer this phone call.

44.     Call #2.  On March 3, 2023, Plaintiff received a phone call that displayed 970-552-0615 on the caller identification.  Plaintiff answered the phone and the telemarketer improperly informed Plaintiff that he was calling from Medicare about COVID-19 test kits.  Plaintiff informed the telemarketer he did not have Medicare and asked the telemarketer not to call again. This was a do-not-call request.

45.     Defendants Shamsi and Dr. Qureshi instructed their telemarketers to improperly pose as official Federal Government Medicare Officials to convince innocent senior citizens to order COVID-19 tests so JD Group could bill Medicare, and Dr. Q could earn a commission.

46.     Pretending to be a federal agent is a federal crime in the United States punishable under

18 U.S.C. § 912.

47.     Dr. Q's agents and/or employees improperly identified themselves as Medicare agents on multiple phone calls at the instruction and direction of Defendant Raja.

48.     Calls #3 and #4.  On March 4, 2023, Plaintiff received two phone calls that displayed 970-552-0615 on the caller identification.  Plaintiff did not answer the phone calls.

49.     Call #5.  On March 6, 2023, Plaintiff received a phone call that displayed 970-552-0615 on the caller identification.  Plaintiff answered the phone call and the telemarketer informed Plaintiff he was calling from Medicare.  Plaintiff informed the telemarketer he did not have Medicare and hung up the phone.

50.     Call # 6.  On March 6, 2023, Defendant Dr. Q called Plaintiff again despite having been told multiple times Plaintiff did not have Medicare and having been delivered a do-not-call request.

51.     Call #7.  On March 7, 2023, Defendant Dr. Q called Plaintiff at 7:58 AM.  Plaintiff answered the phone and informed the telemarketer he did not have Medicare.  Plaintiff hung up the phone.

52.     Calls 8-14.  Plaintiff received seven phone calls from phone number 970-552-0615 that Plaintiff did not answer between March 7, 2023, and March 10, 2023.  This included at least five phone calls on March 10, 2023.

53.     Call #15.  On April 2, 2023, Plaintiff received a phone call that displayed 562-583-2556 on Plaintiff's caller identification.  Plaintiff answered the phone and was solicited for COVID-19 tests via Medicare.  Plaintiff informed the caller he did not have Medicare and discontinued the phone call.

54.     Call #16.  On April 6, 2023, Plaintiff received a phone call that displayed 562-449-0316 on Plaintiff's caller identification.  Plaintiff answered the phone and was solicited for COVID-19 tests via Medicare.  Plaintiff informed the caller he did not have Medicare and discontinued the phone call.

55.     Call #17.  On April 11, 2023, Plaintiff received a phone call that displayed 562-583-2738 on Plaintiff's caller identification.  Plaintiff answered the phone and was solicited for COVID-19 tests via Medicare.  The telemarketer gave Plaintiff his father's Medicare number during the phone call.  Plaintiff was shocked the telemarketer gave out private Medicare information and asked the telemarketer to repeat what he had said.

56.     Plaintiff was then asked by the telemarketer to provide his birthdate.  Plaintiff wanted to find out who was carelessly giving out private Medicare information and played along with the telemarketer.  Plaintiff assumed he wanted his father's birthday since the telemarketer had called Plaintiff "Elston" and had given Plaintiff "Elston's" Medicare information.  Plaintiff gave the telemarketer Elston's birthday.

57.     The telemarketer then informed Plaintiff that he would be enrolled in COVID-19 test shipping.

58.     On April 13, 2023, covid-19 test kits arrived at Plaintiff's father's house in Tyler TX.

59.     The test kits in paragraph 55 were mailed on April 11, 2023, from JD Group, INC, 16064 Beaver Pike, Jackson, Ohio, 45640.  The tracking number of the package was USPS 9400 1112 0620 3301 3167 93.

60.     The shipping label included the email address JDGroup@covidtestkitscentral.com.

61.     On April 29, 2023, Plaintiff visited the website https://www.covidtestkitscentral.com. The contact page, https://covidtestkitscentral.com/pages/contact, listed the contact information as

JD Group, 515 Granby Road, Chicopee, MA 01013.  From this information, Plaintiff was able to determine the phone calls had been placed on behalf of JD Group.

62.     JD Group charged Tatum via Medicare for the COVID-19 test kits.  Medicare paid JD Group via the pre-paid Medicare contributions Tatum has been making to Medicare since 1974.

61.     Table A below displays the calls made to Plaintiff by Defendant Dr. Q.

**TABLE A**

| Number: | Date: | Time: | Caller ID: | Notes: |
|---|---|---|---|---|
| 1. | 03/01/2023 | 4:29 PM | 970-552-0615 | Missed Phone Call |
| 2. | 03/03/2023 | 8:29 AM | 970-552-0615 | 32-second call.  Informed the telemarketer I did not have Medicare and to not call back. |
| 3. | 03/04/2023 | 1:38 PM | 970-552-0615 | Missed phone call |
| 4. | 03/04/2023 | 2:11 PM | 970-552-0615 | Missed phone call |
| 5. | 03/06/2023 | 8:09 AM | 970-552-0615 | 16 seconds. Informed I did not have Medicare |
| 6. | 03/06/2023 | 12:45 PM | 970-552-0615 | Missed call |
| 7. | 03/07/2023 | 7:58 AM | 970-552-0615 | 19-second phone call. Told I don't have Medicare and hung up. |
| 8. | 03/07/2023 | 3:31 PM | 970-552-0615 | Missed call |
| 9. | 03/09/2023 | 9:36 PM | 970-552-0615 | Missed call |
| 10. | 03/10/2023 | 11:48 AM | 970-552-0615 | Declined call |
| 11. | 03/10/2023 | 1:38 PM | 970-552-0615 | Missed call |
| 12. | 03/10/2023 | 2:14 PM | 970-552-0615 | Missed call |
| 13. | 03/10/2023 | 2:35 PM | 970-552-0615 | Missed call |
| 14. | 03/10/2023 | 2:58 PM | 970-552-0615 | Missed call |

| 15. | 04/02/2023 | 4:10 PM | 562-583-2556 | Medicare – covid 19 test kits |
| 16. | 04/06/2023 | 9:47 AM | 562-449-0316 | Medicare – covid 19 test kits |
| 17. | 04/11/2023 | 11:32 AM | 562-583-2738 | Sent Covid Test Kits |

62.     On January 27, 2024, Plaintiff searched on the Texas Secretary of State website

https://direct.sos.state.tx.us/telephone/telephonesearch.asp and did not find a valid Texas

Solicitation Registration as required by Texas Business and Commerce Code 302.101 for Dr. Q,

Shamsi, or Dr. Qureshi.

63.     Defendants Dr. Q, Shamsi, and Dr. Qureshi do not have a solicitation registration

certificate on file with the Texas Secretary of State as required to make telephone solicitations to

Texas residents. Plaintiff is a Texas resident.

64.     Defendants do not qualify for an exemption from the requirements of Tex. Bus. Com.

Code 302.101.

65.     Defendant Dr. Q engaged in false and misleading sales practices and unlawful solicitation

calls.

66.     Plaintiff was distraught and aggravated that his father's Medicare information had been

compromised and necessitated Plaintiff spending hours investigating who was misusing his

father's information.

67.     Every call was placed without the maintenance of an internal do-not-call policy. Each call

was placed without training their agents/employees on the use of an internal do-not-call policy.

68.     Plaintiff has limited data storage capacity on his cellular telephone. Incoming

telemarketing calls consumed part of this capacity.

69.     No emergency necessitated the calls.

70.     Through information and belief, Defendant Dr. Q did not have a written do-not-call policy while it was sending Mr. Callier unsolicited calls.

71.     Through information and belief, Defendant Dr. Q did not train their agents who engaged in telemarketing on the existence and use of any do-not-call list.

### THE PHONE CALLS WERE SOLICITATION PHONE CALLS

72.     Dr. Q solicited COVID-19 test kits on behalf of JD Group Inc.

73.     The COVID-19 test kits were not free, as Medicare paid for the test kits on behalf of Tatum with contributions made to Medicare via taxes taken from Tatum's paychecks for 50 years.

74.     Both Dr. Q and JD Group are for-profit organizations.

75.     JD Group sold COVID-19 test kits to Tatum which were paid for by Medicare on behalf of Tatum via Tatum's pre-paid Medicare contributions.

### PERSONAL LIABILITY OF DEFENDANTS SHAMSI AND DR. QURESHI

76.     Defendants Shamsi and Dr. Qureshi personally participated in the calls alleged herein because Defendants Shamsi and Dr. Qureshi personally directed the phone calls be placed and that the caller(s) improperly claim they were calling from "Medicare."

75.     Defendant Shamsi is the managing member of Dr. Q.

76.     Defendant Dr. Qureshi is a managing member of Dr. Q.

77.     Defendant Dr. Qureshi is a medical doctor, well versed in billing Medicare, and is the originator of the idea to obtain Medicare numbers and bill Medicare for COVID test kits.

78.     Defendants Shamsi and Dr. Qureshi are the only members of Defendant Dr. Q.

79.     Defendant Shamsi and Dr. Qureshi are intimately involved in all decision-making and illegal activities of Defendant Dr. Q.

80.     Defendants Shamsi and Dr. Qureshi had direct and personal involvement in and ultimate control over every aspect of Defendant Dr. Q's wrongful conduct that violated the TCPA, and/or directly controlled and authorized this conduct.

81.     There is precedent in the Western District for holding corporate officers personally liable when they participate in the alleged actions:

> "If the officer directly participated in or authorized the statutory violation, even though acting on behalf of the corporation, he may be personally liable.  See *United States v Pollution Serv. Of Oswego, Inc*., 763 F.2d 133, 134-135 (2nd Cir.1985)
>
> The "well-settled" tort rule provides that "when corporate officers directly participate in or authorized the commission of a wrongful act, even if the act is done on behalf of the corporation, they may be personally liable."  *General Motos Acceptance Corp. v. Bates*, 954 F.2d 1081, 1085 (5th Cir. 1992).  The Fifth Circuit has elaborated that "the thrust of the general [tort] rule is that the officer to be held personally liable must have some direct, personal participation in the tort, as where the defendant was the 'guiding spirit' behind the wrongful conduct….or the 'central figure' in the challenged corporate activity."  *Mozingo v. Correct Mfg. Corp*., 752 F.2d 168, 174 (5th Cirt. 1985) (Citing *Escude Cruz v. Ortho Pharmaceutical Corp*., 619 F. 2d 902, 907 (1st Cir.1980)) (Citing *Texas v. American Blastfax, Inc*., 164 F. Supp. 2d 892 (W.D. Tex. 2001)
>
> Quoting Texas v. American Blastfax:
>
> The Court finds the above principles applicable to the TCPA that is, an officer may be personally liable under the TCPA if he had direct, personal participation in or personally authorized the conduct found to have violated the statute, and was not merely tangentially involved.  Individuals who directly (and here, knowingly and willfully) violate the TCPA should not escape liability solely because they are corporate officers.  As the State persuasive argues, to hold otherwise would allow the individual defendants to simply dissolve Blastfax, set-up a new shell corporation, and repeat their conduct.  Congress surely did not intend to permit such a result in passing the TCPA.
>
> To be clear, the Court finds Greg and Michael Horne were the "guiding spirits" an the "central figures" behind the TCPA violations.  They were the two persons who controlled all of Blastfax's day-to-day operations.  They both had direct, personal involvement in and ultimate control over every aspect of Blastfax's wrongful conduct that violate the TCPA, and/or directly controlled and authorized this conduct.  And they did so with their eyes and pocketbooks wide open.  After October 5, 2000, Greg and Michael Horne had good reason to believe they were running a business that violated the TCPA.  On February 9, 2001, they knew they

> were.  Yet they continued to direct their company to send unsolicited intrastate fax advertisements.  This is far more than a simple derivative liability case. Accordingly, the Court *899 holds defendants Greg and Michael Horne are jointly and severally liable with Defendant Blastfax, Inc., for all TCPA damages in this lawsuit."  Texas v. American Blastfax, Inc., 164 F. Supp. 2d 892 (W.D. Tex. 2001).

82.    The Same Court held that corporate officers were also personally liable for DTPA

violations;

> The State contends Greg and Michael Horne are personally liable for any DTPA damages because they were solely responsible for the violating conduct…..For the same reasons discussed in finding the individual defendants personally liable under the TCPA, the Court agrees.  See, e.g., *Barclay v. Johnson*, 686 S.W.2d 334, 336-37 (Tex. Civ. App.-Houston [1ST Dist.] 1985, no writ) (finding personal liability for corporate officer in DTPA misrepresentation claim, based on general rule that "a corporate agent knowingly participating in a tortious of fraudulent act may be held individually liable, even though he performed the act as an agent for the corporation……Accordingly, the Court finds defendants American Blastfax, Inc., Greg Horne and Michael Horne are jointly and severally liable for $6,000 in damages for their violations of the DTPA." *Texas v. American Blastfax, Inc.*, 164 F. Supp. 2d 892 (W.D. Tex. 2001).

83.    Defendants Shamsi and Dr. Qureshi control the day-to-day operations of Dr. Q and

directed their employees, agents, salespersons, and solicitors to make TCPA-violating phone

calls.

84.    Defendant Shamsi and Dr. Qureshi instructed his employees and/or agents to obtain

Medicare numbers without the knowledge or consent of the Medicare recipient.

85.    Defendants Shamsi and Dr. Qureshi paid for the illegally obtained Medicare numbers.

86.    Defendants Shamsi and Dr. Qureshi instructed their employees and/or agents to use the

illegally obtained Medicare numbers to solicit COVID-19 test kits for financial gain.

87.    Defendant Shamsi and Dr. Qureshi are not merely bystanders,  They are the masterminds

who schemed, planned, directed, initiated, and controlled illegal and fraudulent behavior.

86.    Defendants Shamsi and Dr. Qureshi are well aware their conduct violated the TCPA and other Federal and State laws and refused to alter the behavior.  Shamsi and Dr. Qureshi engaged in this illegal behavior for financial gain with full awareness of the illegality of their actions.

## INJURY, HARM, DAMAGES, AND ACTUAL DAMAGES

## AS A RESULT OF THE CALLS

87.    Defendants' calls harmed Plaintiff by causing the very harm that Congress sought to prevent—a "nuisance and invasion of privacy.

88.    Defendants' calls harmed Plaintiff by trespassing upon and interfering with Plaintiff's rights and interests in Plaintiff's cellular telephone.

89.    Defendants' calls harmed Plaintiff by intruding upon Plaintiff's seclusion.

90.    Plaintiff has been harmed, injured, and damaged by the calls including, but not limited to: reduced device storage space, reduced data plan usage, anger, frustration, invasion of privacy, and more frequent charging of my cell phone.

## Plaintiff's Cell Phone is a Residential Number

91.    The calls were to Plaintiff's cellular phone which is Plaintiff's personal cell phone that he uses for personal, family, and household use. Plaintiff maintains no landline phones at his residence and has not done so for at least 17 years and primarily relies on cellular phones to communicate with friends and family. Plaintiff also uses his cell phone for navigation purposes, sending and receiving emails, timing food when cooking, and sending and receiving text messages. Plaintiff further has his cell phone registered in his personal name, pays for the cell phone from his personal accounts, and the phone is not primarily used for any business purpose.

## Violations of the Texas Business and Commerce Code § 302.101

92.     The actions of the defendants violated the Texas Business and Commerce Code 302.101 by placing solicitation phone calls to a Texas resident without having a registration certificate and bond on file with the Texas Secretary of State.

93.     Texas Business and Commerce Code § 302.101 provides a private right of action. A violation of Chapter 302 "is a false, misleading, or deceptive act or practice under Subchapter E, Chapter 17" and is enforceable as such: "A public or private right or remedy prescribed by Subchapter E, Chapter 17, may be used to enforce [Chapter 302." Tex. Bus. & Com. Code § 302.303.

94.     The use or employment by any person of a false, misleading, or deceptive act or practice" causes "economic damages or damages for mental anguish." Tex. Bus. & Com. Code § 17.50.

95.     Texas Business and Commerce Code §302.101 states that a person (1) "may not make a telephone solicitation" (a) "from a location in [Texas]" or (b) "to a purchaser located in [Texas]," (2) "unless the [person] holds a registration certificate for the business location from which the telephone solicitation is made." Tex. Bus. & Com. Code § 302.101(a).

96.     Under Texas Business and Commerce Code § 302.302(a) Plaintiff is entitled to seek damages of up to $5,000 per violation under §302.101.

97.     Under Texas Business and Commerce Code § 302.302(d) Plaintiff is entitled to all reasonable costs of prosecuting the case including attorney's fees, deposition costs, investigation costs, and witness fees.

## I.  FIRST CLAIM FOR RELIEF
### (Violation of the TCPA "Sales Call/DNC" Prohibition, 47 U.S.C. § 227(c) et seq.)
### (Against All Defendants)

98.     Plaintiff realleges and incorporates by reference each and every allegation set forth in paragraphs 1-97.

99.     Defendant called Plaintiff's private residential telephone number which was successfully registered on the National Do-Not-Call Registry more than thirty-one (31) days prior to the calls, in violation of 47 U.S.C. § 227(c)(3)(F), and 47 C.F.R. § 64.1200(c)(2).

100.    Plaintiff was statutorily damaged at least seventeen (17) times under 47 U.S.C. § 227(c)(3)(F) by Defendant by the telephone calls described above, in the amount of $500.00 per call.

101.    Plaintiff was further statutorily damaged because Defendant willfully or knowingly violated this subsection of the TCPA. Plaintiff requests that the court treble the damage amount as permitted under U.S.C. § 227(c)(5) for each and every willful or knowing violation.

102.    As a result of Defendant's violations of 47 U.S.C. § 227(c)(3)(F), and 47 C.F.R. § 64.1200(c)(2), Plaintiff seeks $500 in statutory damages, or $1,500.00 if trebled, for each and every violation, pursuant to 47 U.S.C. § 227(c)(3)(F).

103.    Pursuant to 47 U.S.C. § 227(c)(5)(A), Plaintiff also seeks a permanent injunction prohibiting Defendant and their affiliates and agents from making non-emergency telemarketing robocalls to cellular telephone numbers without the prior express written consent of the called party.

## II.    SECOND CLAIM FOR RELIEF
### (Violations of The Texas Business and Commerce Code 302.101)

### (Against All Defendants)

104.     Plaintiff realleges and incorporates by reference each and every allegation set forth in paragraphs 1-97.

105.     The foregoing acts and omissions of Defendants and/or their affiliates or agents constitute multiple violations of the **Texas Business and Commerce Code 302.101**, by making

non-registered solicitation calls to Plaintiff's cellular telephone number without his prior express written consent.

106.    Mr. Callier is entitled to an award of up to $5,000 in damages for each such knowing or willful violation. **Texas Business and Commerce Code 302.302(a)**.

107.    Plaintiff is entitled to an award of all reasonable costs of prosecuting the action including court costs, investigation costs, deposition expenses, witness fees, and attorney's fees.  **Texas Business and Commerce Code 302.302(d).**

### III.    PRAYER FOR RELIEF

WHEREFORE, Plaintiff Brandon Callier prays for judgment against the defendants jointly and severally as follows:

A.    Leave to amend this Complaint to name additional DOESs as they are identified and to conform to the evidence presented at trial;

B.    A declaration that actions complained of herein by Defendants violate the TCPA and Texas state law;

C.    An injunction enjoining Defendant and their affiliates and agents from engaging in the unlawful conduct set forth herein;

D.    An award of $1,500 per call in statutory damages arising from the TCPA intentional violations jointly and severally against the corporation for seventeen (17) calls.

E.    An award of $5,000 in statutory damages arising from seventeen (17) violations of the Texas Business and Commerce code 302.101.

F.    An award to Plaintiff of damages, as allowed by law under the TCPA;

G.    An award to Plaintiff of interest, costs, and attorneys' fees, as allowed by law and equity.

H.    Such further relief as the Court deems necessary, just, and proper.

Dated:  January 30, 2024,                     Respectfully submitted,

                                               /s/ Brandon Callier

                                               _____

                                               Brandon Callier
                                               Plaintiff, Pro Se
                                               1490 A George Dieter Drive
                                               #174
                                               El Paso, TX 79936
                                               915-383-4604
                                               Callier74@gmail.com

## I.        <u>**Demand for Jury Trial**</u>

Plaintiff hereby demands a trial by jury on all claims so triable.

Dated: January 30, 2024,                      /s/ Brandon Callier

                                               _____

                                               Brandon Callier
                                               Plaintiff, Pro Se
                                               1490A George Dieter Drive
                                               #174
                                               El Paso, TX 79936
                                               915-383-4604
                                               Callier74@gmail.com